Filed 3/23/21  P. v. Castillo CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B304080 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA087019) |
| v. | |
| GONZALO JAVIER CASTILLO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel B. Feldstern, Judge.  Affirmed.

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Gonzalo Javier Castillo (defendant) appeals from the judgment following his conviction for first degree murder. Defendant contends there was insufficient evidence of premeditation and deliberation to support his conviction. He further contends the trial court erred by not instructing the jury on imperfect self-defense. We conclude there was sufficient evidence to support the conviction, and any failure to instruct on imperfect self-defense was harmless. Accordingly, we affirm.

## FACTUAL BACKGROUND

### 1. *Prosecution case*

On August 17, 2016, around 2:40 p.m., Estela Alvarez saw a shadow pass by the window as she sat in her living room. Looking out the window, she saw a man jump over her fence and go down the driveway of the property across the street. The man was moving quickly.

Alvarez went to the bedroom where her husband, Salvador Martinez, was and told him what she had seen. Two or three minutes later, Martinez went over to the property across the street to see what was happening.

The property across the street had two dwellings on it, a house in front and a converted garage in back. Martinez knew the man who lived in the garage, Michael Millington, age 69. Martinez checked the front house first before moving towards the converted garage.

As Martinez got close to the garage, he heard Millington saying, " 'Why are you doing this to me? Why are you doing this to me?' " Martinez yelled that the police were coming, and called 911. The time stamp on the 911 call was 2:44 p.m. During the call, Martinez reported he could hear "screaming" and "[s]omeone

2

is attacking someone in the garage." Shortly thereafter he reported that "[t]he screams have quieted down now."

When the police arrived, they found Millington lying face up on the floor, motionless and not breathing. On the bed was a wok-like pan with one of the sides deformed. There were no signs of forced entry. Millington was wearing pajama pants and a dark colored shirt, and had ear plugs in both ears, one of which had dried blood stains on it.

The police set up a perimeter. A resident of a nearby house discovered defendant hiding on her property and informed the police, who arrested him. Defendant was not wearing a shirt when the police found him.

In addition to the wok-like pan found on the bed in Millington's home, detectives found a frying pan containing what appeared to be liquid bleach sitting on a stove burner. The burner was on and the liquid was bubbling. Detectives also found a pair of sunglasses on the floor, and an empty magazine from an Airsoft pellet gun.

The police found a pillowcase matching the sheets on Millington's bed near some trash cans next to the property where defendant was arrested. In the pillowcase was an Airsoft pellet pistol, a pill bottle, two cell phones, one of which was shattered, and a torn t-shirt. The pistol was like a BB gun, capable of causing injury if loaded. The empty magazine found in Millington's house fit the Airsoft pistol. Also found near the trash cans was a bottle of Clorox bleach-type house cleaner.

The police determined that the shattered cell phone belonged to defendant, and the other phone belonged to Millington. Both Millington's and defendant's blood was found on the wok-like pan, the torn t-shirt, and the undamaged cell phone.

Millington's autopsy indicated he died from traumatic asphyxiation due to blunt force injuries of the neck.  Specifically, his Adam's apple was fractured and transected from his windpipe, which prevented him from breathing.  Such an injury would require significant force to achieve; the evidence showed Millington had sustained multiple blows to the neck.  Although the forensic pathologist could not say definitively the wok-like pan caused the injuries, his measurements were consistent with that theory.

Millington also had suffered what appeared to be a single forceful blow to the chest that fractured his breastbone, ribs, and vertebrae.  He had multiple contusions and a laceration on his face.  He had contusions and abrasions on his hands, arms, legs, and feet.  Some of the hand injuries could be offensive wounds, perhaps from Millington punching someone, and some could be defensive.  The injuries on the arms and legs suggested defensive wounds.

## 2.    *Defense case*

At around 2:30 or 2:40 p.m. the day of the homicide, Matthew Picado was pulling his car out of his driveway in the neighborhood where the homicide took place.  He saw a man with a ripped shirt run into the driveway and disappear into Picado's backyard.  He looked frantic and in a hurry.

Gabriel Rebolledo was the police officer who transported defendant to the police station after his arrest.  Defendant was sweating and began banging his head on the open partition dividing the front and rear seats of the police car.  Rebolledo told defendant he did not want defendant to hurt himself.  Defendant said, " 'I don't have anything against you guys, just the guy who

4

fucked my wife.' " Then he said, " 'You guys should have just killed me.' "

A number of relatives and acquaintances of defendant testified to his good character. They also testified that in the months leading up to the homicide his behavior changed. For example, the tire shop he owned became disorganized, he believed he was being watched or followed, and he believed people were coming into his apartment and planting things in his truck. His cousin testified defendant was using crystal methamphetamine. The cousin also testified that after defendant was arrested, his girlfriend, Maria Melgar, told the cousin that a month earlier defendant had told Melgar he believed she was cheating on him.

### a.    Maria Melgar

Melgar testified she had been defendant's girlfriend for the five years prior to the homicide.[1] She claimed he was never violent, never yelled at her, and never acted jealous or accused her of having an affair.

About a year before the homicide Melgar noticed changes in defendant's behavior. He hardly ate or slept. He would ask her if she heard things, and he disassembled lamps and a DVD player. When they went out, he would say they were being followed. His shop became disorganized. He thought someone had planted something in his truck and went to the police about it. At one point some months before the homicide, he left her a note saying someone was spying on him, possibly the police, and he had found

_____

[1] Although Melgar and defendant were not legally married, he sometimes referred to her as his wife.

two hidden cameras and believed there were more. She was very worried, and thought he had a psychological problem.

A month before the homicide, Melgar found a bag of white powder in defendant's pants. When she asked defendant about it, he said it was drugs.

In August 2016, the month of the homicide, defendant began sleeping at his tire shop, and was distant with Melgar. He slept at the shop the night before the homicide. Melgar went to see him the morning before the homicide and asked him to come home and stop using drugs.

Melgar had an application on her phone that allowed her and defendant to exchange text messages that also notified the recipient of the location of the sender. She did not check her phone until around 5 or 6 p.m. the day of the homicide. Defendant had sent her one message at 2:38 p.m., one at 2:41 p.m., and one at 4:10 p.m. The 2:38 p.m. message included a recording of what sounded like a struggle and a man screaming, "What the fuck are you doing? What the fuck." The 4:10 p.m. message stated, "I need help." The location information from the 2:38 p.m. and 4:10 p.m. messages was in the area of the homicide.

Melgar testified she never had an affair outside her relationship with defendant and did not know Millington. She denied telling defendant's cousin that defendant had accused her of being unfaithful.

### b. Defendant's testimony

Defendant testified on his own behalf. He admitted he was responsible for Millington's death, but claimed he did not remember attacking him.

Defendant testified he began using methamphetamine in October 2015. Two or three months before the homicide, he

began thinking he was being followed, and would hear voices from the radio or television telling him to move or find things. He thought people were coming into his apartment when he wasn't there or were watching him and had planted drugs in his truck to incriminate him.

Defendant started sleeping in his tire shop in August 2016 to hide his drug use from Melgar. In the days just before the homicide, he believed people were going to come to his shop to hurt him. He made a hole in the ceiling of his shop's restroom as an escape route.

The day of the homicide, he left his shop through the ceiling hole, fearful people were coming for him. He testified he had no plan, he just wanted to escape. He remembered running and jumping fences, but did not remember going to Millington's house, beating him with a frying pan, or heating Clorox on the stove. He did not remember sending messages to Melgar. He did remember being arrested, but he did not remember making any statements on the way to the police station or being interviewed by the police. Defendant claimed he never thought Melgar was cheating on him and never accused her of it.

### c.    Defendant's police interview

During defendant's cross-examination, the prosecution played a video of defendant's interview with the police the day of his arrest.[2] During the interview, defendant told police that

---

[2] The prosecution did not play the interview video or introduce any statements from defendant during the prosecution's case-in-chief.

Millington was cheating with his "wife," referring to Melgar.[3] Defendant claimed that a few weeks earlier he had seen a picture from Millington on his wife's phone, as well as text messages exchanged between Melgar and Millington.

Defendant said he went inside Millington's home and saw Millington was sleeping. Defendant had his pellet gun with him to scare Millington. Millington said, " 'What the fuck, what,' " and defendant accused him of cheating with his wife. Defendant and Millington then struggled with one another. Defendant "hit him" and "kill[ed] him." Defendant claimed he broke Millington's neck, and hit him "[t]oo many times." The fight lasted less than 10 minutes.

Defendant had gone to Millington's house intending only to hit Millington, but then "I kill him, actually because I don't want him follow me or-or-or-or him don't get anything, I had to fight— if you know some—you hit somebody or you do something, but these people will, will follow you." Defendant put Clorox in a frying pan to try to burn the house down so he could get away.

Defendant stated that during the fight with Millington he threw his pellet gun under the bed and thought his "wife's sunglasses" were under the bed too. He tried to use his phone to "get the proof or something like that" and also took Millington's phone to get "proof to show my wife" "what's going on."

Asked if he had seen Millington before, defendant said Millington had passed by his tire shop on a prior day, and defendant had followed him and seen where he lived. That is

---

[3] Defendant did not identify Millington by name during the interview, instead calling him a "guy" or "old man." At one point he said he was looking for "Henry" or "Eddie," although it was not clear he was referring to Millington.

how he knew how to find Millington's house. Defendant said he had used methamphetamine about half an hour before going to Millington's house.

Defendant had some injuries on his body, but claimed he had gotten them in his shop beforehand or while running away.

### d. Dr. Andrea Bernhard

The defense called Dr. Andrea Bernhard, a psychologist. She opined that on the day of the homicide, defendant was suffering from drug-induced psychosis, and the delusions guided his behavior. She believed defendant ran from his shop under a delusion that someone was going to hurt him, with no specific idea where he was going, and entered Millington's home seeking refuge. Millington, upset about the intrusion, fought with defendant.

Bernhard further opined that at some point during the fight, defendant saw the sunglasses on the floor, and developed a new delusion that they belonged to Melgar, and that Millington and Melgar were having an affair. Bernhard characterized the offense as have "two portions," the first being defendant running for his life from his shop, entering Millington's home and grabbing the wok-like pan, and the second being the "triggering of the jealous delusions by the sunglasses."

Bernhard testified that defendant's claimed memory loss was consistent with his drug use.

### 3. *Prosecution's rebuttal*

The prosecution called Dr. Kris Mohandie, a clinical, police, and forensic psychologist. Mohandie opined that blackouts and amnesia are not common side effects of methamphetamine use, although delusions and paranoia are. Mohandie thought it was

9

inconsistent with the way memory works for defendant to have recalled the details of the homicide during his police interview but to have completely forgotten them months later. Mohandie diagnosed defendant with methamphetamine-induced psychosis, a variety of substance abuse disorders, and malingering regarding his claim of blackouts. He believed defendant at the time of the homicide was "goal-directed, purposeful, [and] evidenced continuity of purpose and a criminal presence of mind."

## PROCEDURAL BACKGROUND

An information charged defendant with murder (Pen. Code,[4] § 187, subd. (a)), and alleged that in the commission of that offense he personally used a deadly and dangerous weapon, a frying pan (§ 12022, subd. (b)(1)).

Following the prosecution's case-in-chief, defendant argued there was insufficient evidence to support first degree murder based on premeditation and deliberation and moved under section 1118.1 to dismiss any such allegations. The trial court denied the motion.

The jury found defendant guilty of willful, deliberate, and premeditated first degree murder, and found true the weapon allegation. The trial court sentenced defendant to 26 years to life and awarded credits and imposed fines and fees.

---

[4] Unspecified statutory citations are to the Penal Code.

10

## DISCUSSION

### A. The Evidence Presented During the Prosecution's Case-In-Chief Was Sufficient for the Trial Court to Deny the Motion Under Section 1118.1

Defendant argues the prosecution in its case-in-chief presented insufficient evidence of premeditation and deliberation to support a conviction for first degree murder, and therefore the trial court erred in not granting defendant's motion under section 1118.1 to dismiss those allegations. Defendant contends his conviction must be reduced to second degree murder. We disagree.

#### 1. Standard of review

"In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court applies the same standard an appellate court applies in reviewing the sufficiency of the evidence to support a conviction. . . ." (*People v. Cole* (2004) 33 Cal.4th 1158, 1212–1213 (*Cole*).) " 'When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Our review must ' "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." ' [Citation.] Even where . . . the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' [Citations.] The relevant

11

inquiry is whether, in light of all the evidence, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People v. Gomez* (2018) 6 Cal.5th 243, 278 (*Gomez*).)

" 'Where the section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point.' " (*Cole*, *supra*, 33 Cal.4th at p. 1213.)

### 2.    Applicable law

Murder that is "willful, deliberate, and premeditated" is first degree murder. (§ 189, subd. (a).) " ' "In this context, 'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' [Citation.] ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' [Citations.] 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

Our Supreme Court has identified " 'three basic categories' of evidence" the high court "has generally found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and

12

(3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" . . . .' [Citation.]" (*People v. Morales* (2020) 10 Cal.5th 76, 88–89 (*Morales*), quoting *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*).)

These three categories of evidence " ' "are descriptive and neither normative nor exhaustive," ' " and " ' "reviewing courts need not accord them any particular weight." ' [Citation.] *Anderson* provides 'a framework to aid in appellate review,' but it does not 'define the elements of first degree murder or alter the substantive law of murder in any way.' "[5] (*Morales*, *supra*, 10 Cal.5th at p. 89.)

_____

[5] *Anderson*, analyzing past cases, concluded that the Supreme Court "sustains verdicts of first degree murder typically when there is evidence of all three types [i.e., planning, motive, and manner of killing] and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with either [planning] or [manner of killing]." (*Anderson*, *supra*, 70 Cal.2d at p. 27.) As noted in *Morales*, the high court's more recent jurisprudence makes clear there is no requirement that certain of these factors be present or weighted in a particular way. For example, the Supreme Court has upheld first degree murder convictions based solely on "manner of killing" evidence. (See, e.g., *People v. Hawkins* (1995) 10 Cal.4th 920, 957 [evidence of execution-style murder sufficient to support finding of premeditation and deliberation, even when "evidence of planning and motive was indeed minimal if not totally absent"], abrogated on other grounds by *People v. Lasko* (2000) 23 Cal.4th 101.)

### 3. Analysis

Analyzing the *Anderson* factors, defendant argues the only evidence that could possibly suggest planning was testimony that defendant appeared to take a direct route towards Millington's home. This, defendant contends, does not demonstrate an advance plan to kill Millington, particularly given that defendant was carrying only a nonlethal pellet gun. In the end, he used a "weapon of convenience he found at the scene," the wok-like pan.

As for motive, defendant argues that the prosecution failed to introduce any evidence of motive in its case-in-chief—it was not until the defense presented its case that the jury heard of defendant's drug use and delusions that Millington was having an affair with Melgar.

As for the manner of killing, defendant argues the brutal attack appeared to have occurred in a frenzy with an object defendant found at the scene, which does not suggest he had a preconceived design to kill Millington in a particular way.

We acknowledge that the evidence in the prosecution's case-in-chief of premeditation and deliberation was not extensive, particularly given the lack of evidence of motive. We nonetheless conclude, " ' "presum[ing] . . . every fact the jury could reasonably have deduced from the evidence," ' " that "a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt" of deliberate and premeditated murder. (*Gomez, supra,* 6 Cal.5th at p. 278.)

In particular, there was evidence from which the jury could infer that defendant already had an intent to kill when he arrived at Millington's home. Significant to us is not only Alvarez's testimony suggesting that defendant was moving swiftly, directly, and, a jury could infer, purposefully towards

14

Millington's home, but also how quickly after defendant arrived that he attacked and killed Millington. According to Martinez, he walked across the street to see what was happening within two or three minutes after Alvarez saw defendant pass through their yard and go down Millington's driveway. He checked the front house first, then moved towards Millington's home, at which point he heard Millington yelling, "Why are you doing this to me?" According to Martinez's call to 911, Millington's screaming stopped soon after—the jury reasonably could infer this was because Millington was dead or close to it. Under this timeline, therefore, it would appear that only a few minutes passed between defendant's arrival at Millington's home and defendant attacking and killing Millington.

This short timeframe means that, if defendant did not intend to kill Millington when he first arrived, he quickly developed an intent to kill within minutes of his arrival, an intent so strong that it led to a brutal beating with blows forceful enough to break multiple bones and destroy Millington's windpipe. That defendant would so quickly and dramatically switch mental states seems unlikely given that Millington was in his pajamas and wearing earplugs, from which the jury could infer Millington did not converse with or conduct some sort of business with defendant, at least not to any significant extent. Millington's plea of "Why are you doing this to me?" further suggests Millington was bewildered by the sudden attack, which in turn suggests Millington did not provoke it in some way.

In short, a jury reasonably could conclude that, given the short period between defendant's arrival and his severe attack on Millington, with evidence suggesting Millington did not provoke the attack, it was implausible beyond a reasonable doubt that

15

defendant developed an intent to kill *after* his arrival.  Although this reasoning may not fit cleanly into the framework of the *Anderson* factors, those factors, again, " ' "are descriptive and neither normative nor exhaustive," ' " and we " ' "need not accord them any particular weight." ' "  (*Morales*, *supra*, 10 Cal.5th at p. 89.)

## B.     The Evidence Presented Was Sufficient to Support the First Degree Murder Conviction

Defendant argues that the sum total of evidence presented at trial was insufficient to support his first degree murder conviction.  Our conclusion that the evidence presented during the prosecution's case-in-chief alone was sufficient to support his conviction defeats this argument.

We note, however, that the evidence became only stronger once the prosecution presented defendant's police interview when cross-examining defendant.  That interview provided evidence of motive, namely defendant's perception that Millington was having an affair with Melgar.  Defendant stated he had known of the affair for weeks prior to the killing and knew where Millington lived because he had followed him home one day.  He stated that he went to Millington's home to confront him about the purported affair.  Although he claimed to have intended only to hit or scare Millington, the jury was entitled to disbelieve that portion of his statement.  (See *People v. Wader* (1993) 5 Cal.4th 610, 641 [jury "free to believe some of defendant's statements and to disbelieve other statements"].)  Defendant's statement provided ample evidence from which the jury could infer that he went to Millington's home with the intent to kill him over what he believed was Melgar's affair with Millington.

16

Defendant argues this motive evidence was "contained in [defendant's] methamphetamine[-]fueled delusions," and therefore was not credible. The fact that the basis of defendant's murderous intent may have been delusional or inaccurate does not change the fact that he had murderous intent. To the extent defendant is arguing that none of his statements to the police may be trusted given his delusional state, on appeal we do not resolve credibility issues. (*Gomez*, *supra*, 6 Cal.5th at p. 278.) The jurors were well aware of the evidence of defendant's drug use and could weigh for themselves how that information affected his credibility.

## C.  Any Error in Not Instructing on Imperfect Self-Defense Was Harmless

The trial court denied defense counsel's request to instruct the jury on imperfect self-defense. Defendant claims this was error. We disagree.

" ' " 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' " ' [Citation.] Imperfect self-defense 'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 648.) "This doctrine is a ' "narrow" ' one and 'will apply only when the defendant has an actual belief in the need for self-defense and only when the defendant fears

17

immediate harm that " ' "*must be instantly dealt with.*" ' " ' [Citation.]" (*People v. Landry* (2016) 2 Cal.5th 52, 97–98.)

" '[I]mperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter. Thus the trial court must instruct on this doctrine . . . whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter.' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).)

Defendant argues there was sufficient evidence to support the theory that, beset by methamphetamine-induced delusions, he ran into Millington's converted garage to escape from imagined pursuers, unaware Millington was inside. Millington, "alarmed that someone entered his simple abode, confronted [defendant], resulting in offensive injuries to [Millington]." Defendant then believed, albeit unreasonably, that he had to defend himself from Millington's unexpected attack.

We need not decide whether the trial court erred in not providing an imperfect self-defense instruction, because any error was harmless. Even without the instruction, had the jury believed that defendant killed Millington in response to being surprised while hiding from imagined pursuers, the jury would not have found defendant guilty of deliberate and premeditated first degree murder, but instead second degree murder. Having not done so, the jury implicitly rejected the theory that defendant killed Millington spontaneously out of fear, and therefore would have reached the same result even with an imperfect self-defense instruction. (See *Manriquez*, *supra*, 37 Cal.4th at p. 582 [jury's verdict of first degree murder "implicitly rejected defendant's version of the events, leaving no doubt the jury would have

returned the same verdict had it been instructed regarding imperfect self-defense"]; *People v. Lewis* (2001) 25 Cal.4th 610, 646 ["Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions."].)

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



CHANEY, J.